## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| R&P SEAFOOD/SHELLFISH, INC. & | ) | |
| FOUR SEAS, INC. | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | Case No. 05-cv-10420-MLW |
| | ) | |
| KENNEBUNK SAVINGS BANK, | ) | |
| | ) | |
| Defendant | ) | |

### DEFENDANT'S MOTION IN LIMINE
### TO EXCLUDE TESTIMONY OF RICHARD A. CLARKE

NOW COMES Defendant, Kennebunk Savings Bank, (hereafter "the Bank" or "KSB") by and through its attorneys, Thompson & Bowie, LLP, and pursuant to the Court's Order Setting Case for Trial dated March 1, 2006, *see* Docket at Entry No. 21, hereby submits its motion in limine to bar testimony of Richard A. Clarke as follows.

### Background

Plaintiffs have designated Mr. Clarke to testify as an expert in this matter. *See* Exhibits 1-2, Plaintiffs' Expert Witness Disclosure with attached Plaintiffs' Expert Witness Report. Mr. Clarke was deposed by counsel for KSB in this matter on April 12, 2006. *See* Exhibit 3, Transcript of Deposition of Richard A. Clarke. In sum, Mr. Clarke intends to challenge the Bank's statements in the October 2004 letter regarding the status of the Preble account and address his purported knowledge of banking industry standards, as outlined in his Report. *See* Exhibit 2 at first two pages. While Mr. Clarke began working in banking in 1969, he has not worked in a bank since 1991; instead, he provides consulting services and serves as an expert witness. *See id.* at curriculum vitae.

**Argument**

Richard Clarke should be barred from testifying as an expert in this case. He has demonstrated that he is not qualified to provide expert opinions and his opinions lack adequate foundation. His proffered testimony is not sufficiently reliable. Nor does it satisfy the special relevancy requirement for admission of expert testimony. *Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.,* 161 F.3d 77 (1st Cir. 1998). He does not support his contentions with adequate methodology, and to the extent he attempts to support his testimony with personal experience, he does not explain how his "experience led to the conclusion[s] reached, why that experience [is] a sufficient basis for the opinion, and how that experience [is] reliably applied to the facts." Fed.R.Evid. 702, Advisory Committee Note. Rather, he simply presents inappropriate *ipse dixit*[1] testimony. Moreover, the information proffered does not require an expert's analysis.

Before the Plaintiffs may use the testimony of Richard Clarke they must establish a proper foundation under Rule 702 of the Federal Rules of Evidence and satisfy the *Daubert* trilogy. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); *Kumho Tire Co. v. Carmichael,* 526 U.S. 137 (1997); and *General Electric Co. v. Joiner,* 522 U.S. 136 (1997).

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. It provides that a proposed expert witness must be sufficiently qualified to assist the trier of fact, and that his expert testimony must be relevant to the task at hand and rest on a reliable basis:

---

[1] "Ipse dixit: He himself said it; a bare assertion resting on the authority of an individual." <u>Black's Law Dictionary</u> (6th ed. 1990).

> [i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

Under *Daubert*, the Court makes a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology can be applied to the facts at issue." *Daubert,* 509 U.S. at at 592-93.  Many factors may bear on this inquiry, for example whether a scientific technique has been subjected to peer review and whether it has received general acceptance.  *See id.* at 593-94.  This so called "gate keeping" obligation applies to all types of expert testimony, not just "scientific" testimony.  *See Kumho Tire Co., Ltd v. Carmichael*, 526 U.S. 137 (1999).

In *Daubert* the Supreme Court stressed the importance of the trial court's gate keeping function:

> [e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than lay witnesses.

*Daubert*, 509 U.S. at 595.  The issue is:

> whether "(a) the opinions and conclusions of the expert are accompanied by information that enables the factfinder to evaluate

> the likely accuracy of the expert's opinion, and (b) the information is presented in such a way that the factfinders will not be fooled into excessively overvaluing the testimony."

*United States v. Green,* 405 F.Supp.2d 104, 119 (D.Mass. 2005) (J. Gertner).

In addition to assessing the expert's qualifications to render an opinion, the Court must also consider the <u>reliability</u> of the proffered scientific testimony. Specifically, the Court considers:

1. whether the opinion has or is capable of being tested;
2. whether the theory or technique upon which the opinion is based has been subject to publication and peer review;
3. whether the theory has a known or potential rate of error;
4. whether any standards exist to control the operations of the technique;
5. whether facts and data relied upon are of a type reasonably relied upon by experts in the particular field; and
6. the general acceptance of the scientific theory.

*See, e.g., Sutera v. Perrier Group of America, Inc.*, 986 F.Supp. 655, 661 (D. Mass. 1997) (J. Saris).

Whether *Daubert's* suggested indicia of reliability apply to any given testimony depends on the nature of the issue at hand, the witness's particular expertise and the subject of the testimony. *See Kumho,* 526 U.S. at 147-51. It is a fact-specific inquiry. *See, e.g., Black v. Food Lion, Inc.*, 171 F.3d 308, 311 (5th Cir. 1999). The Court's responsibility "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field". *Kumho,* 526 U.S. at 152.

Notwithstanding any expert's qualifications, the Court must ensure that there is some scientific methodology involved in the conclusions that are reached. For example, as stated in *Smith v. Ford Motor Company,* 215 F.3d 713 (7th Cir. 2000):

> In analyzing the reliability of proposed expert testimony, the role of the court is to determine whether the expert is qualified in the relevant field and to examine the methodology the expert has used in reaching [her] conclusions . . . A court's reliability analysis does not end with its conclusion that an expert is qualified to testify about a given matter. Even "[a] supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some scientific method."

*Smith,* 215 F.3d at 718 (quoting *Clark v. Takata Corp.*, 192 F.3d 750, 759 n. 5 (7th Cir. 1999)). Clarke is seeking to "waltz" here. His opinions are not based on methodology. His opinions are simply what he believes to be true based on his impressions of banking from working in commercial lending many years ago and his general references to the Risk Management Associates trade organization. Yet, as the Court has recognized:

> The issue is not whether the field in general uses a reliable methodology, but the reliability of the expert's methodology in *the case at bar,* i.e. whether it is valid for the purposes for which it is being offered, or what the Court has described as the question of "fit."

*See United States v. Green,* 405 F.Supp.2d 104, 119 (D.Mass. 2005) (J. Gertner) (emphasis in original). Clarke has demonstrated that he is not employing any reliable methodology in this case, as demonstrated in the sample excerpts from his testimony cited below.

The *Daubert* admissibility analysis does not require the Plaintiffs to establish that the expert is correct in his conclusions, rather they must show that his opinions have sufficient indicia of reliability to warrant presentation to a jury:

> *Daubert* does not require that the party who proffers expert testimony carry the burden of proving to the judge that the expert's assessment of the situation is correct … . It demands only that the proponent of the evidence show that the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion.

*Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998). Clarke fails to meet this standard.

The Supreme Court has made plain that gate keeping requires more than taking the expert's word for it:

> Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit*[2] of the expert.

*General Electric Co. v. Joiner,* 522 U.S. 136, 146 (1997). Mr. Clarke's proffered testimony is the type of *ipse dixit* testimony that the Supreme Court in the *Daubert* trilogy sought to eliminate. *Cf., e.g., Brown v. Wal-Mart,* 402 F.Supp.2d 303, 307-310 (D.Me. 2005) (applying *Daubert* trilogy, discussing same).

Finally, under the "special relevancy requirement" for the admission of expert testimony the First Circuit explained in *Ruiz-Troche,* the testimony must not only be relevant under Fed.R.Evid. 402, but also in the "incremental sense that the expert's proposed opinion, if admitted, likely would assist the trier of fact to understand or

determine a fact in issue.  In other words, Rule 702, as visualized through the *Daubert* prism, requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Ruiz-Troche,* 161 F.3d at 81 (quoting *Daubert,* 509 U.S. at 592).  Since Clarke's opinions are scientifically unreliable, this deficiency makes them irrelevant and inadmissible—they will not assist the trier of fact.

Clarke's deposition testimony makes plain that he fails the *Daubert* triology standards for admissibility of expert evidence.  He only vaguely references "industry practice" and "Robert Morris Associates" or "Risk Management Associates" in his deposition, does not provide concrete support and specific methodology for his opinions and is unaware of state guidelines addressing the confidentiality of commercial credit information held by banks.  *See,* Clarke Deposition, (Exhibit 3), *passim; see, e.g., id.* at p. 43 lines 9-10 (is not a member of RMA [Risk Management Associates]); p. 45 lines 4-10 (does not hold the industry CRC, Credit Risk Certified, designation and does not know what it is); p. 49 lines 13-15 (has not given a lot of thought as to what the Bank should have done in response to Preble's request for a letter); p. 57 line 22 – p. 60 line 13 (unable to articulate industry standards); p. 60 line 14 – p. 66 line 9 (gives his own assessment that caveats should have been added to use of characterizations provided for in the RMA industry guidelines; demonstrates lack of familiarity with Maine banking standards and non-specified knowledge of Massachusetts standards—*see also* p. 17 line 21 – p. 18 line 20); and *see generally, e.g.,* p. 18 line 1 – p. 20 line 12 (inability to identify source of data referred to and failure to articulate standards at deposition and expression of intent to research information later).

In sum, Clarke presents conjecture and hypotheses without demonstrating any authoritative basis for his opinions. Repeatedly, when asked for the bases underlying his opinions, Clarke provided no information or indicated he intended to find information, but could not cite it in his testimony. As the First Circuit has noted, "expert opinions, however, are no better than the data and methodology that undergrid them." *See SMS Systems Maintenance Services, Inc. v. Digital Equipment Corp.,* 188 F.3d 11, 25 (1st Cir. 1999). As the *SMS* Court explained further: "an expert must vouchsafe the reliability of the data on which he relies and explain how the cumulation of that data was consistent with standards of the expert's profession." *Id.* citing *Wessman v. Gittens,* 160 F.3d 790, 804-05 (1st Cir. 1998), *Kumho Tire Co. v. Carmichael,* 526 U.S. 137 (1999)). Clarke can not meet these standards.

As the *SMS* Court recognizes, "expert testimony that offers only a bare conclusion is insufficient to prove the expert's point." *SMS,* 188 F.3d at 25 (citing *Mid-State Fertilizer Co. v. Exchange Nat'l Bank,* 877 F.2d 1333, 1339 (7th Cir. 1989) ("An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process."). As the *Mid-State* Court explained:

> "Expertise is a rational process and a rational process implies expressed reasons for judgment." FPC v. Hope Natural Gas Co., 320 U.S. 591 . . .(1944) (Frankfurter, J. dissenting). . .An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process. . .
>
> . . .
>
> Bryan [the expert] offered the court his CV rather than his economic skills. Judges should not be buffaloed by unreasoned expert opinions. . .The importance of safeguarding the integrity of the [judicial] process requires the trial [or appellate] judge, when

> he believes that an expert's testimony has fallen below professional
> standards, to say so, as many judges have done.

*Mid-State,* 877 F.3d at 1340 (additional citations omitted).  Mr. Clarke's proposed

testimony has no indicia of meeting the standards required by the Federal Rules of

Evidence.  It is plainly inappropriate *ipse dixit* which the Supreme Court has

unequivocally stated is improper.  It should be excluded.

## **CONCLUSION**

For all of the foregoing reasons, Defendant respectfully requests that this Motion

in *Limine* be granted and that the Court enter an order excluding testimony of Richard A.

Clarke.

Dated at Portland, Maine this 30th day of May, 2006.

/s/ Lisa F. Bendetson

_____

Lisa F. Bendetson, Esq. (BBO#567069)

/s/ James M. Bowie

_____

James M. Bowie, Esq.
Attorneys for Defendant, Kennebunk Savings Bank

**THOMPSON & BOWIE, LLP**
Three Canal Plaza
P.O. Box 4630
Portland, ME  04112
(207) 774-2500

## CERTIFICATE OF SERVICE

I, James M. Bowie/Lisa F. Bendetson, attorney for Defendant, Kennebunk

Savings Bank, hereby certify that I made service of the foregoing document titled:

"Defendant's Motion in Limine to Exclude Testimony of Richard A. Clarke" with the

Clerk of Court using the CM/ECF system which will send notification of such filing(s) to

the following: Marc D. Kornitsky, Esq.,  and I hereby certify that on this date I did not

mail by the United States Postal Service, said submission to non-registered participants as

there are no non-registered participants for this case.

Dated at Portland, Maine, this 30th day of May, 2006.

/s/ Lisa F. Bendetson
_____
Lisa F. Bendetson, Esq. (BBO#567069)

/s/ James M. Bowie
_____
James M. Bowie, Esq.
Attorneys for Defendant, Kennebunk Savings Bank

**THOMPSON & BOWIE, LLP**
Three Canal Plaza
P.O. Box 4630
Portland, ME  04112
(207) 774-2500

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

R & P SEAFOOD/SHELLFISH, INC., and,
FOUR SEAS, INC.
                    Plaintiffs,


v.
                                          CIVIL ACTION NO. 05-cv-10420-MLW


KENNEBUNK SAVINGS BANK,
                    Defendant.


## PLAINTIFFS' EXPERT WITNESS DISCLOSURE

Pursuant to Rule 26(a), plaintiffs in the above action make the following disclosure of

expert information.  Plaintiffs intend to use Richard A. Clarke, 14 Douglass Green, Woburn, MA

01801-5377 as an expert at trial.  Plaintiffs attach Mr. Clarke's written and signed Report ("Mr.

Clarke's Report") hereto.

Mr. Clarke's Report contains a complete statement of all opinions to be expressed and the

basis and reasons for such opinions, subject to continuing discovery and information related to

the action. Mr. Clarke attaches his curriculum vitae, including his published works and

qualifications to his Report. A listing of any other cases in which the witness has testified as an

expert at trial or by deposition within the preceding four years is included.   Mr. Clarke reviewed

the deposition transcripts of Joel Stevens and Eric Andrews and all exhibits thereto.

1

Plaintiffs (together with Portland Shellfish, Inc., a litigant in a similar case in Maine) have paid a total retainer in the amount of $2,250 to Mr. Clarke and are paying him at an hourly rate of $240.

Plaintiffs reserve their right to designate additional experts in rebuttal to any designation made by the Defendant or to supplement this current designation in the event Mr. Clarke forms additional or different opinions, the substance of the testimony changes and/or he relies on documents outside of those identified herein.

RESPECTFULLY SUBMITTED,
R&P Seafood/Shellfish, Inc. and Four Seas, Inc.
By its attorneys,
Antico, Barrett, Burke & Kornitsky LLP

Marc D. Kornitsky, Esq.
One Essex Green Drive
Peabody, MA 01960
(978) 532-5140

Dated: November 28, 2005

CERTIFICATE OF SERVICE

I hereby certify that on this date, 11-28-05 that a true copy of the above document was served upon for each party appearing pro se and/or the attorney of record of each party by mailing postage prepaid-certified mail return receipt requested /by hand/ constable.

2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

R & P SEAFOOD/SHELLFISH, INC., and,
FOUR SEAS, INC.
                Plaintiffs,

v.

                                    CIVIL ACTION NO. 05-cv-10420-MLW

KENNEBUNK SAVINGS BANK,

                Defendant.

**PLAINTIFFS' EXPERT WITNESS REPORT**
**<u>Opinions and basis therefore</u>**

        I anticipate testifying that the accounts of Robert J. Preble & Sons, Inc. ("Preble") at

Kennebunk Savings Bank (the "Defendant") were not handled in a "satisfactory manner," as

such term is defined by applicable banking guidelines and that the Defendant failed to provide

sufficient information to Plaintiffs concerning the meaning of terms used in the letters addressed

to Plaintiffs dated October 8, 2004 (the "October Letter") as required by applicable banking

standards and guidelines. This opinion will be grounded upon the documents identified below

and my experience.

        I anticipate testifying that Defendant was obligated to inform Plaintiffs of any material

adverse changes to Preble's financial condition after the issuance of the October Letter. This

opinion will be grounded upon the documents identified below and my experience.

I anticipate testifying that Preble did not comply with its contractual commitments and that Preble's alleged compliance with Preble's contractual commitments under relevant loan documents does not mean that the accounts of Preble were handled in a "satisfactory manner" in the commercial lending context. This opinion will be grounded upon the documents identified below and my experience.

I anticipate testifying that it is ordinary practice in the banking industry not to volunteer to provide financial information relating to a customer that has not been requested by the third-party. This opinion will be grounded upon the documents identified below and my experience.

I anticipate testifying that it is not ordinary practice in the banking industry to volunteer to issue multiple letters concerning credit information at one time and to permit the bank customer to hand deliver such letters. This opinion will be grounded upon the documents identified below and my experience.

I anticipate testifying that the Defendant failed to provide the Plaintiffs with relevant information relating to the financial condition of Preble when the Defendant issued the October Letters. While banks are not obligated to respond to requests for credit information, they must provide a complete answer if an answer is proffered. This opinion will be grounded upon the documents identified below and my experience.

## Data and other information considered by the witness in forming the opinions

1.    The Deposition Transcript of Joel Stevens, including exhibits attached thereto

2.    The Deposition Transcript of Eric Andrews, including exhibits attached thereto

3.    Any and all documents produced by the Defendant during discovery

4.    Materials relating to the guidelines promulgated by Risk Management Associates, formerly known as, Robert Morris Associates

## Qualifications

As my attached resume, description of current activities and client list indicate, I have considerable commercial banking experience, with specific expertise regarding commercial lending and resolution of problem loans.  I am also familiar with the New England and national banking market by virtue of my long-term involvement with banks and borrowers active throughout the nation.

My banking career began in 1969 when I entered the credit training program at the First National Bank of Boston (Bank of Boston), a major national and international commercial lender throughout the past three decades.  Subsequent assignments included a lengthy internship in the problem loan unit which involved the resolution of numerous problem credit exposures.  A significant number of these relationships were based in the Northeast and required knowledge of all phases of commercial credit including standards for answering trade credit inquiries.

In the early 1980's, my responsibilities grew to include management not only of the bank's problem loan unit but also the emerging corporate loan review function.  This provided me with direct credit management experience over hundreds of commercial loans with broad exposure to all types of individuals, businesses and their related equity and real estate holdings.

From 1986-1989, as Senior Credit Officer for New England, I supervised approximately $3 billion in commercial loans as well as $5 billion in consumer loans.  My duties included continued oversight of problem New England credit exposures as well as loan operations. Any credit related issues arising in the various BKB trust units were also brought to me for resolution.

During this period, I was named a Director of Casco Northern Corp. and also sat on the Director's Loan Committee.  In 1987, I led the Bank of Boston due diligence team which prepared the analysis for the subsequent acquisition of Bank of Vermont.  I also acted as Senior Credit Officer for Casco-Northern Bank, Bank of Vermont, Rhode Island Hospital Trust and Bank of Boston, Connecticut (formerly Colonial Bank).

When Bank of Boston's Real Estate Group was cited unfavorably by federal regulators in August of 1989 (as were many other Northeast banks), I was selected by senior management to become Senior Credit Officer of that unit to institute reforms.  This assignment added to my real estate knowledge and required me to continue to supervise real estate exposures all around the nation and housed within the various Bank of Boston affiliated banks. I also remained involved in quarterly loan review meetings for all commercial and private banking problem loans throughout New England including on site visits to Casco Bank.

I have chaired the Bank of Boston New England Credit Committee (1986-1989) and Real Estate Credit Committee (1990-1991), been a member of the Bank of Boston Senior Credit

Committee (1986-1991) and supervised the activities of the various credit committees of Bank of Boston subsidiary banks (1986-1991).

As a result of my performance in the foregoing assignments, I was named Chairman of the Robert Morris Associates (RMA) National Real Estate Credit Roundtables in both 1990 and 1991. RMA is the nation's leading professional association of bank lending and credit officers. RMA-sponsored roundtables permit the annual exchange of state-of-the-art banking information, ideas and practices, and are attended by dozens of representatives from the nation's leading banks in each topical area. Since resigning from Bank of Boston, which remains a major client along with its successor Fleet, I have acted as moderator of numerous RMA Roundtables focusing on all phases of bank lending. I wrote and in 1993 RMA published "The Workout Manual" which advises banks as to how to minimize loan losses once a problem has developed.

RMA has been the leading source of banking industry standards for the exchange of commercial credit information for almost 100 years.

Since 1991, I have provided consulting services to approximately thirty-five banks and other financing intermediaries as well as a similar number of bank customers. Therefore, I have had continued experience with banking transactions nationally and in the Northeast region from 1969 right up the present date.

I have lectured frequently throughout the nation on all phases of commercial lending and have given numerous presentations to thousands of commercial lenders over the past two decades covering all types of banking transactions and including loan workout. In late 1986, I participated in a Lender Liability Panel Discussion sponsored by the RMA, the video of which received broad national distribution and, today, I am generally recognized as a leading expert in this area.

Over the past decade, I have been retained to offer  abbreviated credit seminars to the various Bank of Boston units in existence at that time. In  1998, a similar seminar was provided to the Key Bank entity which had acquired Casco Bank.

My RMA duties, bank and business consulting assignments have exposed me to a broad cross section of regional and national business and banking transactions.  Therefore, I am intimately familiar with the type of circumstanced faced by lenders to troubled companies and the credit references provided by Kennebunk Savings Bank.

### Publications authored by the witness within the preceding ten years

"It Pays to Know Your Real Estate Borrower", Commercial Lending Newsletter, Robert Morris Associates, May, 1991.

The Workout Manual, published by Robert Morris Associates, 1993.

"Current Bank Workout Perspectives",  Turnaround & Workouts Survey, Beard Group, published February 15, 1994.

"Financing Local Business", a monthly column published during 1994 by the Woburn Advocate,

Winchester Town Crier and Stoneham Sun.

"Credit Marketing:  The Antidote for Imprudent Credit Standards", <u>Lending and Risk Management News</u>, Robert Morris Associates, March, 1997.

"Top 10 Rules of the Road for Lenders", <u>Lending and Risk Management News</u>, Robert Morris Associates, September, 1997.

"Outside Resources Can Assist Management of Underperforming Borrowers", <u>Lending and Risk Management News</u>, Robert Morris Associates, January, 1998 and Kentucky Banker Magazine, March, 1998.

"Evaluate Performance Risk of All Contractors Carefully", <u>Lending and Risk Management News</u>, Robert Morris Associates, July, 1998.

"Compliance Risk Must Be Handled Effectively", <u>Lending and Risk Management News</u>, Robert Morris Associates, September, 1998.

"Practice Prevailing Banking Standards to Avoid Lender Liability Risk", <u>Lending and Risk Management News</u>, Robert Morris Associates, December, 1998.

"How to Determine the Debt/Equity Equation", Robert Morris Associates, featured on RMA Website beginning the week of 3/18/99, www.rmahq.org.

"Millennium Moments", Robert Morris Associates, featured on RMA Website beginning the week of 10/18/99, www.rmahq.org.

"Credit Negotiations", <u>The Journal of Lending and Credit Risk Management</u>, Robert Morris Associates, May, 2000.

"The Asset Based Lending Credit Crunch", <u>The Journal of Lending and Credit Risk Management</u>, Robert Morris Associates, December, 2000.

"Ten Principles Should Govern Commercial Problem Loan Resolution", <u>The Journal of Lending and Credit Risk Management</u>, TheRisk Management Association (formerly known as Robert Morris Associates), May, 2001.

"Tips for Managing Commercial Banking Litigation" ,<u>The RMA Journal</u>, The Risk Management Association, March, 2002.

"Real Estate Appraisal Review: Lessons from the Past", <u>The RMA Journal,</u> The Risk Management Association, June, 2003.

"Performing Aggregate Analysis", <u>The RMA Journal</u>, The  Risk Management Association, October, 2003.

"The ABL Crunch Revisited", <u>The RMA Journal</u>, The Risk Management Association, July/August, 2004.

## <u>Compensation to be paid for the study and testimony</u>

Plaintiffs (together with Portland Shellfish, Inc., a litigant in a similar case in Maine) have paid a retainer in the amount of $1,500 to Mr. Clarke and are paying him at an hourly rate of $240.

## Listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years

Joseph R. Gamache vs. Kingfield Savings Bank and Gerard R. Belanger. Superior Court, Androscoggin/Cumberland Ctys., State of Maine. Deposition taken 7/19/00.Testimony given 8/3/01.

Gregory Y. Winston et al vs. Cape Code Bank and Trust Company, N.A. et al. Commonwealth of Massachusetts, Barnstable Superior Court. Testimony given 5/9/01.

Charles J. Labin et al vs. Wesley K. Bell et al. Deposition taken 6/12/01.Superior Court of New Jersey, Chancery Division, Atlantic County. Testimony given 7/10/01.

Leo Pelotte et al vs. Border Trust Company. Deposition taken 1/25/02.

Lawrence Savings Bank vs. Roofblok Limited, American Arbitration Association, Boston, Massachusetts. Testimony given 6/5/02.

Clyde V. Alexander, Jr., M.D.vs. Two Winthrop Properties, Inc., et al. Deposition taken 6/21/02.

Richard Anisfield et al vs Winthrop Financial Associates et al. Deposition taken 6/26/02.

Sheila M.Astuccio et al vs. R.K. Ahearn Co., Inc. et al. vs. Family Mutual Savings Bank. Commonwealth of Massachusetts, Lawrence Superior Court. Testimony given 10/23/02.

The Steamship Navigation Company et al. vs. Camden National Bank et al. Deposition taken 10/31/02. Oxford County Superior Court, Maine. Testimony given 9/16/04.

Buffum  et al. vs. Chittenden Bank et al. Deposition taken 8/29/03.

Beal Bank, S.S.B. vs. Dollar Bank, Federal Savings Bank. Deposition taken 1/15/04.

Cadlerock, L.L.C. et al. vs. Transamerica Business Credit Corp. Deposition taken 6/3/04.

Fleet National Bank vs. L. Darrell Mayeux. Deposition taken 9/10/04.

Richard A. Clarke

Dated: November 23, 2005

No. of Pages:  80

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

R&P SEAFOOD/SHELLFISH,        )
INC. & FOUR SEAS, INC.,       )
                              )
        Plaintiffs,           )
                              )    Case No.
vs.                           )    05-CV-10420-MLW
                              )
KENNEBUNK SAVINGS BANK,       )
                              )
        Defendant.            )
- - - - - - - - - - - X       )

    DEPOSITION of RICHARD A. CLARKE, a witness
called on behalf of the Defendant, pursuant to the
Massachusetts Rules of Civil Procedure, before
Allyson M. Danforth, RPR, a Stenographer and Notary
Public in and for the Commonwealth of
Massachusetts, at the offices of ANTICO, BARRETT,
BURKE & KORNITSKY, One Essex Green, Peabody,
Massachusetts, on Wednesday, April 12, 2006,
commencing at the hour of 1:00 p.m.

**DANFORTH REPORTING**
**P.O. BOX 246**
**Wenham, MA  01984**
**(978) 921-1321   FAX (978) 921-2222**

APPEARANCES:


JAMES M. BOWIE, Esquire,

THOMPSON & BOWIE, LLP

THREE CANAL PLAZA

P.O. BOX 4630

PORTLAND, ME  04112

Appearing on behalf of Defendant


MARC D. KORNITSKY, Esquire,

ANTICO, BARRETT, BURKE & KORNITSKY, LLP

ONE ESSEX GREEN DRIVE

PEABODY, MA  01960

Appearing on behalf of Plaintiffs

ALSO PRESENT:

    Susan F. Hoctor, Esq.

    Michael Scola

**I N D E X**

WITNESS:  RICHARD A. CLARKE

Examinations                                          Page

 DIRECT EXAMINATION                                     5
 BY MR. BOWIE

**E X H I B I T S**

No. Description                                        Page

 1    Notice of Taking Deposition                       4

 2    Plaintiff's Expert Witness Disclosure             4

 3    Plaintiff's Expert Witness Report                 4

 4    File Folder                                       8

 5    RMA Materials                                     11

* Original Exhibits Retained by Atty. Bowie

1                    S T I P U L A T I O N S

2         It is hereby stipulated and agreed by and

3    between counsel for the respective parties that the

4    deponent will read and sign the deposition

5    transcript under the pains and penalties of perjury

6    within (30) days of receipt of same or it is deemed

7    to have been signed; that the notarization and

8    filing are hereby waived.

9         It is further stipulated and agreed that all

10   objections, except objections as to the form of the

11   questions and all motions to strike, will be

12   reserved until the time of trial.

13

14   Thereupon,

15                    RICHARD A. CLARKE,

16   having been satisfactorily identified and duly

17   sworn, was examined and testified upon his oath as

18   follows:

19             (Exhibit Number 1 was marked for

20        Identification.)

21             (Exhibit Number 2 was marked for

22        Identification.)

23             (Exhibit Number 3 was marked for

24        Identification.)

DIRECT EXAMINATION

BY MR. BOWIE:

    Q.  Would you state your full name, please?

    A.  Richard A. Clarke.

    Q.  Mr. Clarke, obviously you've been deposed before, including by me, but I'm going to give you a couple of quick comments about this afternoon's exercise.  First, if I ask you a question that you do not understand, I would ask that you please tell me that you don't understand the question.  Do you understand that direction?

    A.  I do understand.

    Q.  You also understand that if you answer a question, I will assume that you have understood it.  Do you understand that?

    A.  Yes.

    Q.  If I ask you a question that you wish to refer to your file to answer, please feel free to do so.  Do you understand that?

    A.  Yes.

    Q.  And you also understand that if you wish to take a break at any time, I will accommodate that request, however, if there's a pending question, I'm going to ask that you answer the question

1      before we break, obviously subject to direction

2      from counsel.  Do you understand that?

3          A.  I understand.

4          Q.  Okay.  I'm going to show you what has been

5      marked as deposition exhibit number 1 and ask if

6      you've seen that before?

7          A.  Yes.

8          Q.  And do you recognize that to be actually

9      the notice of the original date that we set for

10     your deposition?

11         A.  I'm not sure.  There were so many false

12     starts there, but this is the -- I believe the

13     operative schedule A, if that's what you would like

14     me to say.

15         Q.  Yes.  Have you brought documents responsive

16     to the request for production in the notice of

17     deposition with you today?

18         A.  Yes.

19         Q.  And can I see them, please?

20         A.  Okay.  You want them in order?

21         Q.  Yes, please.

22         A.  Let's just take it as we have it here.

23     Let's see what this is.  What I've done is I have

24     taken the deposition exhibits and I've date

1    sequenced the ones, which I felt were more

2    significant.

3        So that's what I have in this file.  And

4    this is the residue.  These are things that I did

5    consider, but obviously set aside.

6    Q.  Okay.  If I can take the stack that you

7    just said were most relevant.  Can I take those,

8    please, and we'll mark those.

9    A.  Okay.  Just as a point of privilege, the

10    last time I did a deposition with you, you made my

11    file an exhibit, which was -- created great

12    difficulty for me, although we didn't go to trial.

13    Had we gone to trial, I would have had to operate

14    out of several files.

15        So if there's a document that I have that

16    you would like to make an exhibit, fine, but I

17    don't want to have a situation where I have my own

18    documents in a certain particular order that I then

19    can't deal with in the future.

20    Q.  Mr. Clarke, we will mark that.  If you want

21    to make a copy, I'll work with Mr. Kornitsky,

22    that's fine, but I think I'm entitled to mark it

23    and utilize it so that I know --

24        MR. KORNITSKY:  Are you going to reference

1    things within the stack?

2         MR. BOWIE:  I don't know even what's in it

3    yet.

4         MR. KORNITSKY:  Can we first just take a

5    peak at it?  Maybe we do some type of

6    compromise, as to how to mark it.

7         MR. BOWIE:  I don't have a problem with his

8    retaining the original or we can make copies

9    or however, but --

10        MR. KORNITSKY:  Right.  We're going to let

11   you take the originals --

12   A.  As long as once the deposition is over, if

13   we go to trial, I'm free to deal with my file in my

14   own fashion and to reorganize it or add or

15   supplement or what have you.

16        MR. KORNITSKY:  I think he's just looking

17   to see what you brought.  I think we have some

18   other stuff, too, that's been brought, but

19   it's separate.

20        MR. BOWIE:  Mark that as exhibit 4, please.

21        (Exhibit Number 4 was marked for

22   Identification.)

23   Q.  Starting with exhibit 4, which I understand

24   is the packet of material that you have indicated

1    are more significant documents, is that correct?

2        A.  Yes.

3        Q.  Okay.  Can you tell me what the first page

4    is?

5        A.  Yes.  The first two pages are notes, which

6    I customarily take as I review documents in

7    depositions.

8        Q.  If I can turn back to those first two

9    pages, there are both -- there's a summary that is

10   typed and then there are a variety of handwritten

11   notes on that.  Can you tell, first of all, who

12   typed the summary?

13       A.  I did.

14       Q.  Okay.  And the handwritten notes?

15       A.  Those are my notes.

16       Q.  Okay.  And when did you prepare the

17   summary, if you know?

18       A.  The summary was prepared in conjunction

19   with my original designation as an expert in the

20   disclosure.  And what I -- as my practice -- as is

21   my practice because I was preparing last night and

22   today, as I went through the documents I just made

23   additional notations by hand.

24       Q.  Okay.  Can I see that, please?

1        A.   (Handing.)

2        Q.   Mr. Clarke, there are a variety of

3   handwritten notations on a variety of the documents

4   contained in exhibit number 4.   Are those your

5   notations?

6        A.   Yes.

7        Q.   What else have you produced here today?

8   You produced a folder which includes, you said,

9   documents that you have reviewed, but are less

10  significant than the items that are contained in

11  what I have marked as exhibit number 4, is that the

12  folder that I have in front of me?

13       A.   Yes.

14       Q.   What other documents are you producing here

15  today?

16       A.   I was asked to bring the RMA -- which is an

17  acronym for Risk Management Associates, formerly

18  Robert Morris Associates -- materials in my file

19  pertaining to credit inquiries, which is this

20  folder.

21       Q.   Are all of the materials that you have

22  handed me in the file that is marked RMA credit

23  materials from RMA?

24       A.   Yes.

1      Q.   There are a variety of items that have been

2   highlighted in the RMA materials.  Were they

3   highlighted for this case or another case?

4      A.   For both.  I had those in my files and I've

5   used them in several other cases.  So some of the

6   highlights pertain here, but some pertain to other

7   cases as well.  They're a very useful set of

8   documents.

9          MR. BOWIE:  If you can mark that as exhibit

10         number 5, please.

11         MR. KORNITSKY:  The originals of that -- I

12         think he's going to want to retain the

13         originals.  So he'll retain the originals on

14         some of these items?

15         MR. BOWIE:  No.

16         MR. KORNITSKY:  We will just make a copy.

17         (Exhibit Number 5 was marked for

18   Identification.)

19      Q.   Mr. Clarke, I've marked as exhibit number 5

20   the folder of RMA materials, is that correct?

21      A.   Yes.

22      Q.   Okay.  What else have you produced?

23      A.   These are additional -- again -- items,

24   which were deposition exhibits in the present case,

```
 1    which again I considered, but decided I didn't
 2    need -- didn't need to really revisit those again,
 3    at least appearing for my deposition.
 4         I'm not discounting these things by the
 5    way, it's just when I prepare for deposition, I try
 6    to put the documents that tell the story in date
 7    sequence.  So those are additional documents that
 8    are not in the date sequence.  Then I have
 9    deposition -- the depositions of Mr. Andrews and
10    Mr. Stevens.
11         Q.  What other materials?
12         MR. KORNITSKY:  We have some others here,
13         too.
14         A.  These are just additional things in my file
15    that are probably more administrative in nature
16    pertaining to the case.
17         Q.  Okay.
18         A.  Your notice also -- in fact, I only noticed
19    this the other day in item number one refers to
20    cases -- plural -- against Kennebunk Savings.  So
21    here's an old friend of yours.
22         Q.  The file that you've just handed me is the
23    file that you have in the -- from the case of
24    Corekos (PHONETIC) versus Kennebunk Savings Bank,
```

1     is that correct?

2         A.   That's correct.  And although it was marked

3     as a prior deposition exhibit, it may or may not

4     contain all of the items that were in there and

5     probably has a few new things as well.

6         Q.   All right.  What other materials do you

7     have?

8         A.   Just a blank file that had some stuff in

9     it.  You asked for my billing schedule.  You have

10    that in the disclosure.  Items 2, 3 and 4 you have

11    already -- I think have already been provided.

12        Q.   What's the folder that you have below your

13    arm currently?

14        A.   Again these are just additional items that

15    I brought out of a sense of prudence.

16        Q.   Can I see them, please?

17             MR. KORNITSKY:   That's what he's paid to my

18        office, I believe.

19        A.   I have bills.  And the rest, I think, is

20    just pretty well a duplicate of what you've already

21    gotten.  My publications.  I do have a client

22    listing in here, in case you want to get into who

23    I've worked with up in Maine in the last 13 years.

24    You're certainly welcome to that.  I think these

1    are all duplicate.

2         MR. BOWIE:  Marc, I'm going to want a copy

3         of all of those.

4         MR. KORNITSKY:  I can get somebody working

5         on it right now.  Do you want me to do it now

6         or afterwards?

7    A.   Excuse me, we're not done yet.

8    Q.   Okay.

9    A.   I also have notes from the depositions and

10   also just the notes from the RMA documents in the

11   file.  That's what these things are.

12   Q.   What is the other remaining notes in your

13   portfolio?  Do they relate to this case?

14   A.   It's just names of -- names of the players,

15   a little bit of a to-do list of things that I've

16   got to deal with here today, and a chronology of

17   events.

18   Q.   I would like to have that as well.

19   A.   Okay.

20   Q.   And is there anything else?

21   A.   Yes.  My you know typed present summary of

22   time charges since the last bill was typed.

23   Q.   I will want that as well.

24   A.   (Handing.)

1           MR. KORNITSKY:  Anything in your pockets?

2      Q.  Do you have -- do you maintain computer

3  files with regards to this matter?

4      A.  No.  I believe that I've satisfied all of

5  the items requested in schedule A to the extent

6  that I have them.

7      Q.  Do you have any other file materials that

8  you have accumulated in any way relating to your

9  review of this case?

10      A.  No.

11      Q.  Have you reviewed any other materials,

12  other than those that you've produced today, in

13  order to formulate your opinions with regard to

14  this case?

15      A.  Yes.

16      Q.  And can you identify what those are,

17  please?

18      A.  I was provided this morning with an item

19  here.  It's a credit report produced by Seafax,

20  which is a credit agency that many people in the

21  industry use for credit information and it's -- I'm

22  looking for a date on here to identify it better.

23           The last date I see here is 07/28/04.  Here

24  it is 07/28/04.

1      Q.  Okay.  Have you reviewed any other

2    materials, in order to formulate your opinions with

3    regard to this case?

4    A.  Yes.  I --

5      MR. KORNITSKY:  I don't know if you

6    reviewed this or not.  This is something I

7    faxed you yesterday.

8      THE WITNESS:  I didn't receive it.  My fax

9    machine is only on when people call me to tell

10    me they're sending something.  So whatever it

11    was, I didn't see it.

12      MR. BOWIE:  Is that an item that you intend

13    to have him review, as we go on?

14      MR. KORNITSKY:  I don't believe so.  Now

15    that I've talked to him a little bit about it,

16    no, I don't.

17    A.  I did add some items to this packet that

18    were not previously -- I mean -- in response to

19    your question, I'm not sure how you phrased it, but

20    there are documents in here, which I've reviewed

21    since I did my disclosure or approved the

22    disclosure provided by counsel.

23      MR. KORNITSKY:  This document I don't think

24    was in there.  This is one thing I showed you

1      this morning.

2          A.   I'm sorry, I didn't see this.  It's a file

3      memo from a Cindy Stewart dated June 15, 2004.  I

4      also went on the Internet this morning.  As you'll

5      see from my notes here, on the second page, there

6      were some open issues and I wanted to get the

7      specific federal reserve -- FDIC definitions of

8      OLEM substandards.

9              And believe it or not, I could not find a

10     clear iteration, so in my file I have a -- some

11     language and I don't even know where it came from,

12     but at least in my experience it appears to

13     represent the gist of what we're told by the

14     regulators, as far as these ratings categories and

15     it's attached to this file here.

16             I don't even know where I got that.  But

17     based on my experience, it does appear to be

18     representative of what you would find in banks

19     making an attempt to explain to their officers what

20     these ratings are.

21         Q.   So that I'm clear, Mr. Clarke, the items

22     that you just were referring to are the last two

23     pages of exhibit 4, is that correct?

24         A.   Yes.

```
 1        Q.  And you can't identify for me where that

 2   document comes from?

 3        A.  No, but I will say that the language

 4   therein is the typical language that one sees being

 5   produced by the various regulatory bodies, as far

 6   as guidance for risk ratings.

 7        Q.  Which regulatory bodies are you referring

 8   to?

 9        A.  Here I'm not sure, but since -- for the

10   past few years -- and certainly during the time

11   period of this report -- all of their material in

12   effect is common to all of the agencies, so I would

13   say those ratings are common to both the OCC and

14   the FDIC, as well as state regulators.

15        Q.  Do you know whether these documents are

16   consistent with either regulations or internal

17   documents with the Maine Bureau of Business

18   Regulation, as it relates to banking and financial

19   institutions?

20        A.  I do not.

21        Q.  Do you know when the last two pages of

22   exhibit number 4 were prepared?

23        A.  No.  I would -- certainly, if this becomes

24   an issue before trial, I will get the latest and
```

1    official iteration or iterations, but I was

2    satisfied that that's representative of the

3    language that's in play in banks of --

4         Q.  Mr. Clarke --

5         A.  May I finish, please?  -- in banks in New

6    England of the same size as -- as Kennebunk

7    Savings.

8         Q.  Mr. Clarke, the purpose of taking your

9    deposition today, sir, is to prepare for trial and

10   have the information that you intend to rely on at

11   trial.  If you intend to get further information, I

12   would like you to identify what further information

13   you intend to get prior to trial.

14        A.  Sure.

15        Q.  Do you intend currently to get additional

16   information with regard to definitions of terms to

17   describe a bank's relationship with a customer?

18        A.  Certainly that's a broad question.  I think

19   more -- I think if I can phrase it, I think I can

20   phrase it better for you.  That which you just

21   asked is so general that I really can't answer it.

22             I do intend to get a document that exhibits

23   the guidance that bank's receive from their

24   regulators regarding these rating categories.  I'm

1    satisfied that what I have is -- is representative,

2    however, I don't have a date and a source.

3            MR. BOWIE:  That's going to be done,

4        Marc -- so the record's clear, I think I'm

5        entitled to that.  I think I'm entitled to it,

6        frankly, as of today, but I understand that it

7        is not here so -- but the record is clear, if

8        there is a supplementation, as we go along

9        towards trial, I'm certainly going to ask that

10       you make it prompt, because I will object at

11       this late time.

12           MR. KORNITSKY:  I understand.

13       A.   In fact, what I really need to do at this

14   point in time is to offer a correction to the

15   disclosure that you received from Mr. Kornitsky.  I

16   will answer your question, but I think before I

17   answer, I've got to do that first.

18       Q.   I have marked the disclosure and the --

19   your report as exhibits 2 and 3.  So in order to

20   put that in context, exhibit number 2 is the

21   pleading, which is Mr. Kornitsky's disclosure.

22   Have you seen that before?

23       A.   I believe I have.

24       Q.   Okay.

1      A.   Yes.

2      Q.   And exhibit number 3 is a report, as I

3 understand it, which summarizes your testimony, is

4 that correct?

5      A.   Yes.

6      Q.   Okay.  And you've indicated that you want

7 to make a correction to that disclosure.  Can you

8 tell what that correction is, please?

9      A.   Yes.  On page 2 --

10      Q.   And this is in exhibit 3?

11      A.   Exhibit 3.  It says, "Any and all documents

12 produced by the defendant during discovery."

13           MR. KORNITSKY:  At number 3.

14      A.   Right.  I do not believe I have done that.

15 I don't know -- there are many documents that I

16 would still like to see.  I understand production

17 is ongoing, but I'm sure that there were documents

18 produced that I have not seen.  And so that's not a

19 correct statement and it's an error on my part for

20 which I apologize.

21           MR. BOWIE:  Again if there's going to be

22      more information provided to this witness for

23      his testimony at trial, I would object to not

24      having provided it today.  This is my

```
 1          opportunity to depose the witness to find out
 2          what he's got to say.
 3               MR. KORNITSKY:  Well, what he is saying is,
 4          what he's given you is what he's relied on.
 5          The disclosure said that he reviewed
 6          everything that had been provided by defense
 7          counsel.  That was in error.  I didn't provide
 8          him with the deposition of Vinny Clough, I did
 9          not provide him with the deposition from my
10          clients.
11               Things that are related to the bank, I have
12          provided him with.  Additionally, I don't have
13          any information back yet from Seafax.  And I
14          only gave him a couple of things from the SBA
15          from CEI.  But what I have provided to
16          Mr. Clarke, you have.  If I give him anything
17          else, I will give it to you.
18               MR. BOWIE:  That's the part that I was
19          trying to establish.
20          A.   Excuse me, I believe there's a pending
21     question that I interrupted.  And you asked me what
22     other items would I intend to seek or look at.
23          Q.   Yep.
24          A.   If you go to page 2, right on the top of --
```

1    I see you don't have a copy -- of my notes, when I

2    prepared this disclosure, I did not have available

3    to me any interim figures for a good part of the

4    year 2004.

5         And I understand that the figures were

6    provided to the bank and I would very much like to

7    see the latest financial statement provided to the

8    bank prior to the date that these -- these letters

9    were issued on October 8.

10        And I think it reflects in my notes it was

11   an open item at the time of the disclosure and I'm

12   still awaiting those figures.

13        MR. BOWIE:  Marc, what might be easier, if

14        we could makes copies of the first two pages

15        of exhibit 4 -- the summary that he's reading

16        from.

17        MR. KORNITSKY:  If you want to start with

18        that, I can make copies right now.

19        MR. BOWIE:  If you could make copies and

20        start with that.

21        (Discussion off the record.)

22   Q.   Mr. Clarke, do you have in front of you the

23   first two pages of exhibit 4?

24   A.   Yes.

```
 1          Q.   Okay.  On the second page you have
 2     indicated that there were a variety of open
 3     issues -- I think is the word you characterized
 4     them?
 5          A.   Yes.
 6          Q.   And you've indicated that at least some --
 7     or at least on one occasion you were looking for
 8     some additional or financial statements or updated
 9     numbers.  Where are you -- to what part of the page
10     are you referring to?
11          A.   Well, down at the bottom it says, "To do
12     slash questions."
13          Q.   Yes.
14          A.   On the second item it says, "What did
15     06/30/04 interim show."  That's my cryptic language
16     for saying what were the latest figures in hand by
17     the bank at the time these letters were issued.
18     There is a list of other obviously open items there
19     as well.
20          Q.   My first question is for you with regard to
21     the first two pages of exhibit 4 -- I'm sorry, let
22     me back up.  Are there other items that you were
23     specific -- that you currently intend to get
24     further information about?
```

1       A.   Not -- no, other than what's listed here.

2   And some of these, I think, have been satisfied.

3       Q.   If we could turn to the first page of

4   exhibit 4 then.  I apologize for doing this and I'm

5   not going to ask you each and every time I can't

6   read your writing what it says, but for the first

7   two pages, I think it would be helpful for me to

8   know.

9            So if we can start at the top, could you

10  just read for the record what that first notation

11  is?

12      A.   Certainly.  Although may I characterize it

13  first?

14      Q.   Yeah, that would be helpful.

15      A.   I was just trying to summarize what the

16  total exposure was -- and I'll refer to the bank as

17  KSB, if I may -- during the time period of this

18  situation as it developed.

19      Q.   So starting with that, can you tell me what

20  the notation of the top of the first page of

21  exhibit 4 says and secondly what it means?

22      A.   Well, it says, "Owed $1,161,000 total," and

23  then I have the components, but just in general

24  terms because these seem to be maximum amounts and

1    I didn't go to the trouble of getting down to

2    dollars and cents.

3          And then to the right of that I have, "A

4    total of $1.4 million."  And that's based on a

5    credit presentation dated October 12, '04.

6    Q.  Below the term that says, "Owes $1.16

7    million," is that a correct total?

8    A.  Right.

9    Q.  And there is an arrow and a comment, can

10   you tell me what that says?

11   A.  It says, "Actually higher.  See page 7 of

12   April 27, '04 presentation."  It says, "Pres," but

13   that's an abbreviation.

14   Q.  And to the right of the bracket at the top

15   of the page there are a series of numbers and then

16   a writing beyond that.  Can you tell me what those

17   are, please?

18   A.  All right.  It says, "750,000 R slash E,"

19   which stands for the real estate loan to Preble

20   Properties.  "$500,000 A slash R line," standing

21   for accounts receivable.  "100,000 L slash C line,"

22   for letters of credit in an approximate amount of

23   150,000 in second mortgages.

24   Q.  Okay.  To the right of the very first line

1    where it says "$750,000 real estate," can you tell

2    me what that notation is?

3        A.   Yes.   It says, "Preble Properties, LLC."

4        Q.   Moving down to, "Bank concerned with Preble

5    risk," can you tell me what the writing to the

6    right of that is?

7        A.   Again I have abbreviations here, so I'll

8    give you the full -- the unabbreviated text, "Use

9    exhibit 14 quotes dash prepared in 2003."

10       Q.   And exhibit 14's deposition, is deposition

11   exhibit 14?

12       A.   It's either Andrews or the president, one

13   of the two.  And I can tell you in a second, if you

14   would like me to.

15       Q.   I think we tried to maintain one set of

16   numbers in this case.  I won't promise that we were

17   good at it, but I can tell you that I thought we

18   tried to do that.

19       A.   Well, if you did -- anyway, it is exhibit

20   14 in one of the two depositions.

21       Q.   All right.  The next additional line is to

22   the right of, "Major losses 2002, 2003," what does

23   that say?

24       A.   The losses -- it says, "Significant per

1    exhibit 13 dated 04/26/04."

2        Q.   Then as we drop down to the left of

3    "insolvent" is the term, "big time," is that

4    correct?

5        A.   You betcha.

6        Q.   And to the right of that line is,

7    "04/27/04" something?

8        A.   "Presentation."  It says, "P-R-E-S," but

9    that's my abbreviation for presentation.

10       Q.   Then to the right of, "Unable to service

11   debt," is a notation.  Can you tell me what that

12   says?

13       A.   It says, "Late KSB payments, exhibit 19,"

14   which is dated 11/26/04.  And then, "comma exhibit

15   14 regarding negative debt service coverage."

16   Again I have abbreviations here I'm sounding out,

17   but that's what it means.

18       Q.   Below that you have, "Weak G-T-O-R," and a

19   typed portion.  First of all, what is G-T-O-R?

20       A.   Guarantors.

21       Q.   And to the right of that is a date and some

22   handwriting.  Can you tell me what that says?

23       A.   "04/27/04 pres," for presentation.

24       Q.   And then to the right of that is an

1   additional line.  Can you tell me what that says,

2   please?

3       A.  "Undersecured.  Exhibit 2 dated," I believe

4   it's, "10/27/03."  I have trouble with my own

5   writing, too.  And then a, "hyphen for separate

6   borrower," with a, "question mark."

7       Q.  As we go to the left of the page, there is

8   a comment and I can't read what that says either.

9   Can you tell me what the comment just below, "big

10  time" is?

11      A.  Yes, "Inability to meet forecasts," and the

12  reference is "04/27/04 presentation."

13      Q.  And below that we have a line running

14  toward the typed -- September 30, '04 financial.

15  What does that comment say?

16      A.  It says, "Should have reviewed before

17  sending letter."

18      Q.  And below that is, "Hiring outside

19  consultant red flag," there is a handwritten

20  notation after that.  Can you tell me what that is,

21  please?

22      A.  "Exhibit 10."  And this also just reminds

23  me that there's a quote in there, "Extensive

24  discussion."

1        Q.  To the right of that in the margin, if you

2    will, of the first page is some handwriting.  Can

3    you tell me what that comment or comments are?

4        A.  Yes.  "Internal dispute, exhibit 8 dated

5    June 28, '04."

6        Q.  Does the next comment immediately below it

7    go with that comment?

8        A.  No, it's just a separate negative.

9        Q.  And what does that next comment say?

10       A.  "A slash P squeeze," standing for accounts

11   payable.  "October 6, '04 letter."

12       Q.  And then below the typed comment, "Request

13   for multiple trade letters a sure tip-off of severe

14   problems."  What does that say?

15       A.  It says, "Cash flow less than policy, page

16   9 of April 27, '04 presentation."

17       Q.  Immediately below that is an additional

18   line.  Does that go with that same comment?

19       A.  Right, it's another reference.  And I'm

20   having trouble with the date, but there is an

21   additional document -- and I can't tell whether

22   it's, "October or December 2nd, '04 document also."

23       Q.  In the margin to the left of the section

24   that is entitled, "Term quote satisfactory end

1     quote, usage and letter," is a handwritten comment.

2     Can you tell me what that says, please?

3         A.   Yes.   "10/12/04 presentation for emergency

4     financing."

5         Q.   Okay.   And then at the very bottom of that

6     section is a comment.   Can you read that for me,

7     please?

8         A.   It says, "If no improvement shown,

9     downgrade to substandard, (04/27/04 presentation),

10    page 9."

11        Q.   And is the handwriting below that part of

12    the same comment?

13        A.   Yes.

14        Q.   What does that say?

15        A.   "Failed to downgrade per 10/12/04

16    presentation."

17        Q.   All right.   If we could turn to page 2,

18    please.   First line, "Also pending possible events

19    not disclosed."   There is a line after that and

20    then a comment.   Can you read what that says,

21    please?

22        A.   Yes.   It says, "Refs" meaning references,

23    "pending re-fi, dependent on SBA subordination."

24        Q.   And then below that there is typed, "Bank's

1    respond to specific vendor requests prin," and then

2    something written.

3        A.  Well, I corrected it.  The typed version

4    was, "Principal 4," and I corrected it to,

5    "Principal 3."

6        Q.  And then to the right of that is some

7    handwriting.  Can you tell me what that says,

8    please?

9        A.  Yes.  "All materials start with request

10   from inquirer, also KSB policy."

11       Q.  At the -- in the paragraph of your notes on

12   page 2 it starts, "Erroneous responses."  In the

13   second line there appears to be either a correction

14   or a note or both.  Can you tell me what that is,

15   please?

16       A.  Yes.  It appears that -- well, there's a

17   typo.  And the intent here was to show a date,

18   "10/08/04," so that's what that correction is.

19       Q.  And the writing immediately above it?

20       A.  That relates to the first line.  And it

21   says, "Code article one."

22       Q.  And when you say "code," what code are you

23   referring to?

24       A.  One of the RMA documents.

```
 1         Q.   And then, as we go down below the --

 2    "believed Preble had to ask him to do it," is two

 3    lines.  Can you tell me what those say, please?

 4         A.   "See two-way street publication," which

 5    again is in the RMA documents.  And secondly it

 6    says, "Not required per KSB policy."

 7         Q.   And the last handwritten note, "Everyone

 8    will be glad to know," appears to be at the lower

 9    right-hand margin.  Can you tell me what that says,

10    please?

11         A.   "Need to compare Preble to other KSB policy

12    requirements," and then in parens, "not produced,"

13    with a "question mark."

14         Q.   Okay.  What does that comment mean?

15         A.   One of the things that I would like to

16    do -- and normally in cases of this sort, one of

17    the documents that's available is the loan

18    policies.  And the obvious issue here is whether

19    this loan to Preble was satisfactory or not.  And

20    one of the ways to determine that is to compare it

21    to the bank's policies.

22              And that's an added step, which should be

23    done here, although I was comfortable giving the

24    opinions that I did with what I had in hand.
```

```
 1          Q.  If you would turn to exhibit 3, please,

 2     exhibit 3 is labeled, "Plaintiff's Expert Witness

 3     Report," and it is on page 6 signed by you, as of

 4     November 23, 2005, is that correct?

 5          A.  Yes.

 6          Q.  Okay.  First, did you prepare that

 7     document?

 8          A.  No, I believe it was prepared by counsel

 9     with my editing.

10          Q.  Do you know what the edits were?

11          A.  Not offhand, no.  Not that I can recall,

12     but obviously I missed one and that was the

13     correction that we made earlier.

14          Q.  Is there anyway to tell what edits you

15     made?  In other words, is there any draft or other

16     document that you have that would allow us to

17     figure out what, if any, edits you made?

18          A.  Not in my possession.  Obviously from page

19     3 onward it's just an iteration of all the

20     materials that I myself have prepared.  But in the

21     first two pages, this was provided by counsel.  And

22     this was the second disclosure, I might add.

23              Earlier I did a Maine disclosure.  And the

24     edits for my Maine disclosure I actually can show
```

1    you what they are and this, more or less, tracks

2    it, but it's not exactly the same.  In other words,

3    the Maine disclosure was done first, it was edited,

4    then this was picked up by attorney Kornitsky.

5         Q.  Is the summary of your opinions and the

6    basis for those opinions, as set forth on pages 1

7    and 2 of exhibit 3, accurate as of today?

8         A.  Yes.

9         Q.  Are there any other specific opinions,

10   facts or conclusions -- I understand that there may

11   be some subsidiary facts or conclusions beyond this

12   summary, but are there any other specific facts,

13   opinions or conclusions that you intend to offer

14   that are not summarized on pages one and two?

15        A.  I would offer the outline, which I

16   prepared, as being a more complete document.  I

17   think it fits within the disclosure parameters, but

18   it's much more complete and a much better guide to

19   the kind of references I'm looking at and the kinds

20   of things I might say at trial.

21        Q.  Okay.  That's fair.  I have a few questions

22   with regard to some of the background information,

23   if you will, that's been appended to exhibit number

24   3.  I'm just going to ask you a variety of

1    questions.

2            First of all, can you identify any specific

3    cases in which you have addressed a bank's

4    obligation to person's, other than the bank's

5    customer?

6        A.   I'll have to look at my list.

7        Q.   Yes.

8        A.   The answer is, yes, but to be specific,

9    I'll have to look at my client list.

10       Q.   That's fine.

11       A.   That's why I brought it.  I may miss a few,

12   but I'll do my best.

13       Q.   Yes.

14       A.   Excuse me, could you repeat the question

15   again?

16            (The question was read.)

17       A.   Could you define "cases," please?  I just

18   want to give you a proper answer.

19       Q.   I'm asking for any matter in which you've

20   been involved, whether you've been asked to simply

21   review those issues, whether you've testified by

22   deposition, or whether you've testified at trial.

23       A.   I have advised dozens of banks.  And in

24   doing that, obviously there are obligations to

1    numerous other parties.  So the answer is, I've

2    done it a lot.  I'll give you a few specifics, if

3    you'd like.

4         But it happens as a consultant.  It

5    certainly happens in some of the depositions I've

6    given.  It certainly happens at trial.  And I'll

7    certainly try to pick out a few here that --

8    obviously whenever I do a seminar, it gets into a

9    whole bunch of issues.

10         I'm going to skip the consulting ones

11   because it happens in literally every single bank

12   that I've consulted for.  Here's one Beal Bank.

13   This involved a bank in Pennsylvania -- a dollar

14   bank at Beal Bank.  And again I'm not sure whether

15   there's a confidentiality order or not, but I think

16   I can safely tell you that it was the duties of an

17   agent bank to a participant.

18         We're going to be a while, so you will see.

19    Q.  Okay, that's fine.  I'm out of water.  We

20   can take a short break.

21    A.  I'm going to have to mark this up and make

22   notes because there's going to be a lot of them.

23    Q.  That's fine.

24    A.  Let me just ask a question before we break.

```
 1        Q.   Sure.

 2        A.   When you say "bank," are you interested in

 3   other financial sources or just bank financing?

 4        Q.   For the moment, let's limit it to banks.

 5        A.   Okay, thank you.

 6        Q.   Sure.

 7             (A recess was taken.)

 8        Q.   Mr. Clarke, we broke for you to have an

 9   opportunity to review a part of your client list,

10   in order to identify cases in which you had been

11   asked to address the issue of a bank's obligation

12   to someone other than their customer.

13             And I understand that you've had a chance

14   to briefly examine at least the first four pages of

15   your client list and you've identified at least

16   some of the cases in which that was an issue.  Can

17   you walk through those with me, please?

18        A.   Yes.  Before I get into specifics, let me

19   just say that with many of the law firms here, I've

20   done three and four case and they all run together

21   like alphabet soup.  So for every example I give

22   you, I'm sure on each page there's probably one or

23   two others that I just haven't been able to recall

24   in the short time available here.
```

```
 1              But going to the -- right now I'm involved

 2       in a case called Clinton Savings Bank and it

 3       involves a kiting situation.  And the issue there,

 4       I believe, is the responsibility that a bank has,

 5       as a participant in a kiting situation, to other

 6       parties injured in the kite.

 7          Q.  In that case do you represent Clinton

 8       Savings Bank or do you represent the people making

 9       a claim against Clinton Savings Bank?

10          A.  Clinton Savings Bank.  Coopers & Lilburn,

11       who are now Price, Waterhouse, Coopers.  I've done

12       at least seven matters for them, very few of which

13       have either gotten to deposition or trial, but the

14       issue is the duties that flow between an accounting

15       firm and banks relying on the accounting firm's

16       audit, and the conduct of the banks in relying on

17       audited figures.

18              There's another case here, it's called the

19       D'Esopo case.  D-'-E-S-O-P-O.  This is a claim

20       against Shawmut Bank by an injured third party.

21       And I can't really remember the specifics, but she

22       was not a customer -- a direct customer of the

23       bank.

24          Q.  Do you know whether that involved a credit
```

1    report?

2        A.   Excuse me, I'll take it back.   Her father

3    took trust funds in the possession of the Shawmut

4    Bank, so technically she is a bank customer.   I've

5    done work in the case involving the directors of

6    Capital Bank.   And obviously that gets to the

7    duties of a director of a bank and the duties

8    between the bank and the board of directors.

9        I've done a number of cases, either for

10   banks or title companies, where they were

11   litigating over the bank's ability to collect from

12   the title company.   And again it gets into the

13   duties amongst the parties.   I did a case for the

14   Office of Thrift Supervision.

15       I've also done cases for FDIC, again where

16   the gist is the duty of the bank to its regulators

17   and vice versa.   I did a case for an attorney here

18   locally named Morris Gordon, which was fascinating.

19   It related to his serving a writ of attachment on a

20   bank's branch on a Saturday, again for an attaching

21   creditor.

22       I did a case in Rhode Island for an

23   attorney called Gyorgy, G-Y-O-R-G-Y, which related

24   to the duties of a bank to the former owners of a

```
 1    business.  In other words, they were former

 2    customers, not current customers.

 3         I did a case for Remer & Bronstein

 4    regarding the reliance of banks on legal opinions

 5    at closings.  In fact, that was the famous Whistler

 6    case, also known as the manufacturer of the

 7    Fuzzbuster.

 8         I did a case for Hogan & Hartson quite a

 9    while ago relating to credit inquiries, similar to

10    what we have here.

11         Q.  Where was that case?

12         A.  It was tried in Pennsylvania.  The judge's

13    name was Malcolm Muir.  I remember him because he

14    was in his 80's and liked to pick on attorneys

15    appearing before him.  It was one of the central

16    districts of Pennsylvania.  I believe it was in

17    Harrisburg area.

18         I'm sorry, no, he was in the Williamsport

19    area, one of the several seats I think where he

20    held sway.  This is a Spanish bank relying on

21    credit information provided by a U.S. bank.  There

22    have been a number of those cases, by the way, too,

23    I'm just not recalling.  That's one that I do

24    recall.
```

1          There have been a number of cases involving

2     check fraud, so it really basically has to do --

3     between -- the relationship between the bank and

4     the party defrauded, who normally was not a bank

5     customer.  I did a case involving field

6     examinations.  I've done several of those, which

7     really involves the interplay of duties between

8     field examiners, auditors and lenders.

9          I've done cases involving the duties of

10    third-party bank services to various parties -- not

11    bank customers -- to rating agencies and to a whole

12    bunch of other third parties.  Again that's the

13    first four pages.  And again I'm sure just even

14    there, there's probably dozens of cases I've been

15    involved in.

16         If I went and sat with my files and spent

17    two days, I could come up with it, but I've done

18    quite a bit I believe.

19    Q.   You've indicated the case in the central

20    district of Pennsylvania involving a claim by a

21    Spanish bank against another bank arising out of

22    credit inquiries.  Can you think of any specific

23    cases in which you had been involved where the

24    issue had been the bank's responsibility to vendors

1      of the bank customer, who relied upon bank

2      information in making a decision to extend credit

3      or terms to the customer of the bank?

4          A.  I'm sure there have been.  So far they

5      haven't popped up in my review, but I know even

6      within the first four pages there's got to be three

7      or four of those, but they just didn't leap out at

8      me, as I went through it.

9          Q.  Are you currently a member of RMA?

10         A.  No, but they're a client.

11         Q.  Okay.  When you say, "they're a client," in

12     what way?

13         A.  Over the past decade I have put on several

14     seminars in various areas of the country for RMA.

15     I've spoken at their national convention.  They

16     continue to publish my materials and I continue to

17     receive royalties on at least one publication.  So

18     there's an ongoing relationship with RMA.

19         Q.  When did you last do a seminar for RMA?

20         A.  Three or four years ago.

21         Q.  And before that when was the last time you

22     did a seminar for RMA?

23         A.  Some of them are spelled out in my

24     disclosure.  I believe there's probably a couple of

1    others, but that's it.

2        Q.   Other than your receipt of royalties from

3    RMA for articles or other materials that you have

4    authored, have you had any other connection to RMA

5    since the seminar that you did three or four years

6    ago?

7        A.   Yes.

8        Q.   And what was that?

9        A.   We speak to each other fairly frequently on

10   a variety of topics.  I know that I've arranged for

11   access to the RMA libraries for several clients

12   who -- especially law firms, who are doing

13   litigation where RMA publications would be helpful.

14        I believe within the last two years I've

15   published at least one article with them.  There is

16   interaction there, but that's the gist of it.

17        Q.   Were you ever an officer or holder of a

18   particular position with RMA?

19        A.   No.  I was a member, when I was in the

20   banking community.  But it's not customary for

21   people who are not working for institutions,

22   whether they're banks or finance companies, to

23   continue their membership.

24        Q.   Do you know Mr. Lund?

1     A.   Probably do.  And I'll give you even odds

2     he's attended at least one of my seminars, but I do

3     not know him.

4     Q.   Do you hold -- do you know what the Credit

5     Risk Certified designation is?

6     A.   I'm -- not exactly.  Possibly something to

7     do with the SBA, but I'm not sure.

8     Q.   Is it fair to say you do not hold that

9     designation?

10     A.   That's correct.

11     Q.   Mr. Clarke, I'm going to take you up on

12     your suggestion that we discuss the facts and

13     opinions to which you may testify by using the

14     summary that appears as the first two pages of

15     exhibit number 4, rather than working off of

16     exhibit number 3.

17          So if you could turn to that, please.  At

18     the top of the first page under "background," it

19     says, "Clarke advisor to Eastcoast Seafoods."  Can

20     you tell me what role you played with Eastcoast

21     Seafoods?

22     A.   Yes.  I was an advisor to Eastcoast for

23     about four or five years in the late '90s.

24     Q.   And what -- can you tell me a little bit

1     about Eastcoast Seafoods?

2     A.   Eastcoast Seafoods is the largest

3     wholesaler of North American lobster in the country

4     and a major provider of lobster to Europe and other

5     areas as well.

6     Q.   And in what areas were you advising

7     Eastcoast Seafood?

8     A.   I, in effect, acted as a contract CFO for

9     the company.

10     Q.   While I think of it, can you tell me

11     approximately how much of your professional time

12     currently is spent with litigation management?

13     A.   It depends on the year.  I would say last

14     year, probably less than 10 percent.

15     Q.   The year before that?

16     A.   Probably higher, 30 percent.

17     Q.   How about for this year so far?

18     A.   Almost nil until the last month.  I've been

19     very busy the last month.

20     Q.   Turning back to exhibit 4 below the line

21     for, "Clarke advisor to Clarke" -- "to Eastcoast

22     Seafoods," is the indication, "significant other

23     industry experience."  What were you thinking of

24     when you made that notation?

1        A.   Well, first of all, I, as a lending

2   officer, as a worker officer or as a senior credit

3   officer, was probably involved with well over a

4   dozen companies that were either wholesalers or

5   retailers, such as James Hook, Viking Seafoods.

6        I humorously introduced the Ed Dunkin name

7   here earlier, but I can remember -- I almost want

8   to say Share Mark Fisheries, which would probably

9   be correct.  Some of the names that come to mind,

10  Bank of Boston was a major lender to the seafood

11  industry, and so I was involved there.

12       And subsequently I've continued to talk to

13  the principals of Viking.  Not on a client basis,

14  but as friends, as well as the Eastcoast people.

15  And I'm sure there are others that I haven't

16  thought of right now, but those are some

17  representative names.

18       Q.   Okay, the -- can you explain to me what the

19  organization -- the first two pages of exhibit

20  number 4 is?  In other words, you appear to have

21  identified two significant areas that you're going

22  to testify about and then there's additional other

23  issues section where there are a variety of items.

24       I'm going to ask you -- ask if you would

 1    just explain to me what you're intending to do by

 2    organizing it in the way you did?

 3        A.   Well, the first section after the

 4    background is -- simply is my attempt to solidify

 5    whether the bank was really concerned about Preble,

 6    whether it really was a satisfactory relationship

 7    just prior to issuing these letters.

 8             And I believe that it was not satisfactory

 9    and I have a bunch of references here, both in the

10    documents and in the RMA Publications -- I'm sorry,

11    that follows.  But these are the references really

12    in the documents to show that I don't believe that

13    anybody who knows anything about banking could call

14    this a satisfactory relationship at any point in

15    2004.

16        Q.   Okay.  The RMA guidelines provide for a

17    series of ways in which a bank may -- may summarize

18    its relationship with its customer, correct?

19        A.   Yes.

20        Q.   And there are -- satisfactory is one of the

21    ways that the bank may summarize the relationship,

22    correct?

23        A.   Yes.

24        Q.   Can you tell me what the others are?

1          A.   Generally satisfactory and unsatisfactory.

2     It's kind of like excels, pass, fail.

3          Q.   And in this case, what is your position as

4     to what the bank should have said, in terms of

5     characterizing the relationship with Preble?

6          A.   There's a variety of ways that this would

7     be handled.  The bulk of my career was spent doing

8     workouts and handling inquiries of troubled

9     companies and this clearly was a troubled company.

10    And the bank either should have refused to answer

11    or if they did, they really should not have

12    characterized it as satisfactory.

13          I think that -- again I haven't really

14    given this a lot of thought, as to what they should

15    have done, but I would have stuck to the facts and

16    I would not have given an opinion and they did.

17    And I certainly would never have cited a future

18    fact.

19          I would not have volunteered the

20    information without a specific inquiry and without

21    a specific amount.  I mean there are other things

22    that happened there and I've got them listed

23    throughout my notes, but I had no problem rendering

24    the opinions that I did.

1          First of all, this is not a satisfactory

2     credit, especially that the bank should not have

3     acted in the fashion that they did.  There --

4     there's no right answer to what they should have

5     done.  I can give you some scenarios, if you want

6     to take the time.

7          Q.   Sure.

8          A.   One is not to answer.  Another one is to

9     simply say it's a long-standing customer or

10    whatever the timeframe -- I don't recall exactly

11    when this started -- and that they are experiencing

12    difficulties, but the bank continues to work with

13    them.  Okay.  That probably would be the gist of

14    the answer or one alternative answer.

15         Another one would simply be to talk about

16    the length of the relationship, the balances, the

17    loan amounts and not give a recommendation.  And

18    certainly no recommendation was warranted here

19    under these circumstances.

20         Q.   Okay.  When you say "recommendation," what

21    do you mean by a recommendation?

22         A.   In effect, as to whether the bank considers

23    them to be satisfactory.  In effect, although

24    they're not saying we ask you to ship, in effect

1    that's what that letter did.  That was a

2    recommendation.  That was saying, "Guys, it's okay.

3    These guys are restructuring the credit and

4    everything's hunky-dory," and it wasn't hunky-dory

5    and the company really was in trouble.

6         And for openers, if you look at the balance

7    sheet, I'm going to be very interested to see if

8    Mr. Lund can say that a company that's book

9    insolvent by several hundred thousand dollars

10   before intangibles is a satisfactory relationship,

11   especially with the comments and the documents

12   about the importance of leverage.

13        I will be fascinated to find out why they

14   didn't downgrade it to five, when it didn't improve

15   after the credit presentation in the spring of '04.

16   I mean there's all kinds of stuff here that, again,

17   I'd be more than happy to discuss with you and I'm

18   sure we'll be discussing at trial.

19        Q.  Are the items that you have just raised --

20   is it fair to say some of those are summarized

21   under the heading, "Bank concerns with Preble

22   risk"?

23        A.  Yes.

24        Q.  First is, "On a watch list slash OLEM since

1    04/26/04," correct?

2         A.   And that's incorrect.   It actually goes

3    back to '04.   As I was preparing I saw additional

4    references.

5         Q.   What's the significance of that statement?

6         A.   The rating OLEM is not a satisfactory

7    rating.   And if you look at some of the materials

8    that I have here, as far as what OLEM means, I'm

9    sure that someone may argue that it is not a

10   criticized asset, it's the step before criticized,

11   so it is an unsatisfactory or marginal asset of the

12   bank and it's what we call honorable mention.

13        And it is a bank the loan would rather not

14   have and cannot be deemed as satisfactory.   So

15   could someone have said, "generally satisfactory"?

16   Possibly for some OLEM loans.   But what you have

17   here is a loan that was categorized as OLEM, and by

18   the bank's own definition should have been worse,

19   at least before the letters were issued.

20        Q.   Below the "on watch list," there are a

21   whole series of notations that you have been --

22   that you have made that are indented, including,

23   "Major losses 2002, 2003.   Unable to service debt,

24   insolvent with B slash -- deteriorating during

1      2004."

2              Are all of those items that you believe are

3      supportive of what you just stated that you believe

4      that the account should have been downgraded after

5      April of 2004?

6          A.   Yes.  And, in fact, the bank's own

7      statement in April says, "If it doesn't get better,

8      then we should downgrade it further."  And I saw no

9      evidence that it got better, I saw evidence that it

10     got worse.

11         Q.   In what sense do you believe -- what facts

12     are you relying on to say it got worse?

13         A.   It basically -- first of all, the debt

14     service coverage ratio continued to erode, if you

15     look at the different credit iterations, and the

16     losses continued.  I mean among other things.  I

17     mean there were all kinds of evidence.

18              Now the one thing I would like to see --

19     and I'll repeat this -- is interim statements in

20     the summer.  A key issue here is when the bank

21     received the September 30 statement, but I submit,

22     because they were on what we call full following,

23     that they had ample warning that things were not

24     going to be groovy when the September 30 figures

1    arrived.

2         And I can't tell whether they had those

3    September 30 figures before or after they issued

4    the October 8 letter, but they should never have

5    issued that letter under those circumstance, among

6    other reasons, without getting current financials

7    from the borrow.

8         I think, given all the issues here and the

9    fact that four days later they had to go for

10   emergency financing -- in effect, which is what I

11   would characterize it -- to keep this borrower

12   afloat -- I mean lots of other logs for this fire.

13   I'm just giving you some representative examples.

14        Q.   What emergency financing are you referring

15   to?

16        A.   Basically this company had a crisis with

17   their trade payables, as referenced in the October

18   6 request from the company to send out these

19   so-called 16 letters.  And then on October 12 the

20   company provided additional financing -- several

21   hundred thousand dollars to deal with -- again --

22   critical trade payables.

23        That to me, for a bank with an OLEM loan to

24   do that is indicative of emergency financing.

1          Q.   What additional financing, are you saying

2     the bank provided in October?

3          A.   I believe they rewrote the real estate loan

4     and a small amount of the proceeds went to Preble.

5     And I believe there's one other facility, which may

6     also have squeezed out some financing.

7               I think you'll find, when you look at the

8     October 12 presentation, that a couple of hundred

9     thousand dollars was created in liquidity that went

10    to the trade four days after the letter saying it

11    was satisfactory.

12         Q.   We have, "hiring an outside consultant a

13    regular flag."  What's that reference to?

14         A.   Basically most companies, unless they're

15    desperate, will not bring in outside help.  And, in

16    fact, I have an RMA article -- a publication in the

17    list of use of outsiders, which you might find

18    interesting.

19         Q.   What are you referring to there?

20         A.   I believe that they did bring in somebody

21    -- into the company to help them with their

22    problems.  And I can't remember whether that was

23    the guy that ultimately became the -- became the

24    new investor or the new principal.

1      Q.   Do you know when that occurred?

2      A.   Let's go to look at exhibit 10.   I need the

3   date on exhibit 10 to find it easily, if somebody

4   has it.

5           MR. KORNITSKY:   Exhibit 10 to what?

6           THE WITNESS:   You're not going to get it

7      there.   I just have it as exhibit 10.

8      A.   I don't -- again without a date, I'm not

9   going to be able to find it in my stuff.

10     Q.   That's fine.

11     A.   It talks about bringing in someone to help

12   the company.   It also talks about the fact -- and I

13   believe the fact it was -- I want to guess, it was

14   probably the summer of '04.   And it talks about the

15   fact that the credit committee or the loan approval

16   committee had an extensive discussion about this

17   credit.   You do not have extensive discussions

18   about satisfactory credit.

19     Q.   Do you know when the decision was made to

20   seek additional financing?   Basically the

21   refinancing proposal.

22     A.   I saw a letter as I arrived here -- the

23   June letter, which I wasn't aware of before,

24   showing it went back to June.

```
 1          Q.   At the bottom of that summary you have,
 2     "Request for multiple trade letters a sure tip-off
 3     of severe problems."  What's that reference to?
 4          A.   Well, the letter actually refers to -- let
 5     me get the quote from that -- I have to put tabs in
 6     this thing.  Here we go.  This is the October 6
 7     letter, refers to "Our key vendors who are
 8     currently feeling the impact of our AP squeeze."
 9               Satisfactory bank customers do not have an
10     AP squeeze.  Satisfactory bank customers do not go
11     to a bank and ask for 16 letters to vendors.  Okay.
12     All I can tell you is, there are some things that
13     banks do that are prudent, there are some things
14     they do maybe aren't prudent, but there's a
15     majority of banks who feel -- and there are some
16     things that banks do that most banks would never
17     think of doing.  This is the latter.
18          Q.   In --
19          A.   Excuse me.  And also this idea of hand
20     carrying the letter to the vendors, again it's
21     unheard of.
22          Q.   If a bank's customer is having difficulties
23     with its vendors and asks the bank to provide
24     information to those vendors, is it your position
```

1    that the bank should not?

2        A.   Please repeat that again.

3        Q.   If a bank customer is having difficulties

4    with its vendors and seeks information from the

5    bank, in order to assist it with its vendors, is it

6    your position the bank should not assist its

7    customers in that regard?

8        A.   No, but there's a way that it should

9    happen.

10        Q.   How should it happen?

11        A.   It should happen that Preble -- we'll use

12    the present as a hypothetical for names.  Preble

13    should have gone to whichever customer they were

14    concerned about and invited them to check into the

15    bank.

16            It would not have been inappropriate to

17    tell the bank that they may be receiving some

18    calls.  But this way the bank could have understood

19    who the inquirer was, what the purpose of the

20    inquiry was, what kind of credit was being

21    extended.  That's the way it should have happened.

22            It didn't happen that way here.  And if you

23    read both the Robert Morris materials and the

24    bank's own policies, it always starts with a

1    request, an inquiry from the third party, not from

2    other sources.

3        Q.   Okay.  So it is your position that -- that

4    a bank may not provide an unsolicited report to

5    vendors of a bank customer, even if the customer is

6    asking it to do so?

7        A.   Unsolicited from the recipient of the

8    information, that's correct.

9        Q.   And other than the RMA discussion of the

10   manner in which a credit request should be handled,

11   are you aware of any other written document that

12   discusses that issue?

13       A.   Yes, KSB's own policies.

14       Q.   Outside of the bank in the industry are you

15   aware of anything that says, as opposed to advising

16   a bank as to how it should respond to a credit

17   request that it -- are you aware of any document

18   that says you may not provide this information at

19   the request of your customer without a specific

20   request?

21       A.   I have seen specific documents prohibiting

22   volunteering information.  I can recall, as a

23   trainee at Bank of Boston in 1969, being told by

24   Clinton Parkinson, the icy steal head of the credit

```
 1        department, the first thing I came in the door was,

 2        "You do not volunteer information."

 3            Q.   I'm not asking about volunteering

 4        information, I'm asking you about when the customer

 5        requests the bank to provide information to

 6        vendors, are you aware of anything, other than the

 7        RMA document, that tells the bank -- or in the

 8        industry that tells banks you may not do that, you

 9        may not provide information to third parties at the

10        request of your customer, without a specific

11        inquiry?

12            A.   I can't recall other documents, although I

13        have seen them.

14            Q.   Do you think that a bank in the position of

15        Kennebunk Savings Bank has an obligation to work

16        with its customer to assist it in continuing its

17        business relationships with its vendors?

18            A.   Within certain parameters, yes.

19            Q.   In fact, to fairly do that would be, in

20        your view, a violation of the bank's obligation?

21            A.   It's not that cut and dried.  If you read

22        my book The Workout Manual, it tells you under what

23        circumstances a bank should work with its customer.

24        And I'd be happy to give you a copy for $28 today,
```

1    if you haven't gotten it already.

2        Q.   Would you --

3        A.   I mean I have to pay for them for myself.

4    I'm not being a wise guy, but I have it here.

5        Q.   Is it your position that none of the

6    characterizations provided under the RMA

7    guidelines, that is satisfactory, generally

8    satisfactory or unsatisfactory, would be

9    appropriate to describe KSB's relationship with

10   Preble as of October of 2004?

11       A.   I think -- well, they could have said

12   generally satisfactory, but with certain caveats,

13   such as -- by the way, they're book insolvent,

14   they're losing money hand over fist and they have

15   an accounts payable squeeze.  That's why -- to

16   explain it.

17            By saying, "generally satisfactory," that

18   would prompt a need for further inquiry from the

19   vendor.  They could have also said unsatisfactory,

20   which is what I think it was or they could have

21   said nothing, other than to give factual

22   information you know:  Balances, loan balances, and

23   no indication.

24            And again if you read the October 6 letter,

1     although the October 8 letter doesn't say, "This is

2     a recommendation to extend more credit," in effect

3     that's what they were asked for and that's what

4     they complied with.

5          They knew that these vendors receiving that

6     letter were being asked to provide additional

7     credit at that time based on the October 6 letter.

8     Q.  What is the bank's obligation to its

9     customer, if it's asked to provide information to

10    vendors, if the bank feels that any

11    characterization of its relationship should be

12    characterized as unsatisfactory?

13    A.  I think the bank should tell the

14    customer -- it's almost like getting a personal

15    reference.  If someone asks you for a reference and

16    you know it's going to be negative, most people

17    would feel an obligation to tell that person, "If

18    you put me down as a reference, it's going to be

19    negative."  I think the same applies here.

20         On the other hand, they could have

21    answered, as long as they answered properly, which

22    they did not.

23    Q.  You said, "could have answered, as long as

24    they answered properly."  Is it fair to say that

1   what you're saying is what the bank had to tell

2   Preble, in your opinion as of October, was we can't

3   provide this information because if we answer

4   properly, your vendors are going to stop dealing

5   with you?

6        A.   There were so many parts to that question,

7   I don't think I can give you a simple yes or no

8   answer to that, without misleading the Court.

9        Q.   Okay.  Let's back up.  You have indicated

10  that obviously the bank needs to explain to its

11  customer what it needs to say to any third party,

12  before it provides any information at the

13  customer's request, correct?

14       A.   They have no duty to do that, but I would

15  say that that would be an appropriate way to handle

16  it.

17       Q.   If they don't do it and they provide

18  additional information to a bank's customer, they

19  may have violated banking regulations, isn't that

20  correct?

21       A.   It depends on what additional information

22  they give and what state you're in.

23       Q.   Do you know what the statutory references

24  in Maine for dealing with the extent to which bank

1    information in commercial settings is confidential

2    or not?

3        A.   I've seen it.   I don't recall exactly what

4    it was, but I did not believe that it would inhibit

5    the fair exchange of commercial information within

6    the Robert Morris guidelines -- excuse me, Risk

7    Management Association guidelines.

8        Q.   What's the basis for that opinion?

9        A.   I've done a lot of work in Maine.   I've

10   seen that opinion several times because I'm told

11   that Maine law is a little bit more stringent than

12   Massachusetts law and regulations in that regard.

13       So I've seen it in the past, but I did not

14   walk away with a photographic memory of exactly

15   what it says.   I know that Maine is more

16   restrictive than Massachusetts.   I'm much more

17   familiar with Massachusetts, but I do not believe,

18   as I sit here today, that either state would

19   restrict the kinds of information that we're

20   talking about here -- the proper exchange under

21   Robert Morris guidelines.

22       Q.   The RMA guidelines require that any

23   characterization of the bank's relationship be

24   expressed in a manner in which the recipient will

1    understand what that information means, correct?

2        A.  Yes.

3        Q.  How is that accomplished in real life?

4        A.  I think in real life if you have a credit,

5    such as Preble, which is not satisfactory -- and we

6    can debate whether it was generally satisfactory or

7    unsatisfactory -- they should have taken -- just to

8    say satisfactory, that's saying that Preble was an

9    A or B student.  They weren't an A or B student

10   here, they were far from it.  So that was very

11   misleading to say satisfactory.

12       And all I would say is that -- you know

13   just because I'm an experienced banker and I've

14   dealt with these matters for a long time.  I think

15   there are going to be a lot of people observing

16   this case that are going to find the use of

17   "satisfactory" to be absurd, given the economic

18   reality of Preble.

19       Q.  If the customer asks its bank to confirm to

20   its vendors there is, in fact, a refinancing that

21   is being undertaken, what's the bank's obligation

22   in that situation?

23       A.  I think it could be stated factually,

24   however, if the bank believes that the probability

1    of that refinancing to be relatively low, I would

2    not recommend that any bank do that.  And I saw

3    this June letter with great interest because what

4    it says was that either the SBA or its alter ego

5    SEI, was not willing to subordinate back in June.

6         And that was obviously a key to the

7    financing.  And although, obviously the bank made

8    another run at them for approval, I would say that

9    under those circumstances it was not appropriate.

10        Q.   Which letter are you referring to?

11        A.   The one I cited as an additional document.

12   Is it June?

13        MR. KORNITSKY:  It's here.  I'm not sure if

14        it's that one or not.

15        A.   No.  There was a June letter -- I recall a

16   June letter, which basically asks -- where CEI

17   informs the bank that they're not willing to

18   subordinate.

19        MR. KORNITSKY:  That's the one you said --

20        A.   June 15.  There is an internal memo -- I'm

21   sorry, I cited this earlier as a bank a memo.  It's

22   CEI internal memo.  May I read it?

23        Q.   Sure.

24        A.   "On June 3, 2004 I received a request from

1  Eric Andrews from CEI to subordinate our position

2  on the remaining Westfield road property to allow

3  the bank to collateralize the renewal of a letter

4  of credit for the Portland Fish Exchange in the

5  amount of $100,000.

6       "After reviewing the file and

7  Eric's analysis, I am not willing to do so at this

8  time.  I spoke with Eric today, 06/15/04, and

9  explained our position."

10      Q.  Did you have any -- at that point do you

11  know whether there had been any discussions with

12  SBA or any of the -- I'm using SBA to include

13  Coastal and its regulated entities --

14      A.  Fair game.

15      Q.  Did -- do you know whether at that point

16  there had been any refinancing proposal, beyond

17  just a discussion of how they were going to handle

18  the letter of credit?

19      A.  I don't.  Prior to seeing this letter, the

20  first indication I had was -- I'm not sure when

21  this was -- it was either late summer or early fall

22  about the time of the letter, which showed the

23  concept of the restructuring emerging.

24      So I would say at least a part of it.  I

1    don't think that's the whole restructuring, but at

2    least a piece of it they've been told not to expect

3    a subordination.  Nor is it common for the SBA to

4    subordinate, unless they believe the borrower's

5    extremely viable.

6         It's very uncommon, first of all, for them

7    to subordinate.  But certainly in situations where

8    you know if they feel the trends and the quality of

9    company is not satisfactory.

10        Q.  Do you know what experience Mr. Andrews had

11   had with the SBA in similar types of refinancing

12   and in request to the SBA to subordinate its

13   financing?

14        A.  May I refer to my notes?

15        Q.  Sure.

16        A.  (Referring.)  Well, it's not captured in my

17   notes.  Let me just check, I have some right here.

18   Excuse me, I'm going to make a note on this, I just

19   saw something interesting.

20        Q.  What's that?

21        A.  Andrews -- 58 to 59.  I was aware of this,

22   but didn't have it in my notes.  "Several out of

23   formula instances earlier in the year."  Andrews,

24   page 83, "SBA did not share his optimism for a

1    future outlook."  Again that's my summary of what

2    it said.

3        Q.  Do you know when that was?

4        A.  I believe it was probably after the date of

5    the letter.

6        Q.  Do you know more specifically than "after

7    the date of the letter"?

8        A.  I'd have to check the deposition.  I think

9    it fixes it fairly -- fairly precisely, but I

10   wouldn't hazard to give a date right now.  I see

11   nothing in my notes.  I'm not saying it's not in

12   the deposition.  I don't recall whether it was

13   asked or not, but it's certainly not in my notes.

14       Q.  Do you know whether there was any

15   indication from the SBA that it would not

16   subordinate its position with regard to the actual

17   refinancing package at any time prior to the

18   December 15 meeting?

19       A.  No, although I would say that the June 15

20   letter was a sneak preview.

21       Q.  Do you know where the Westfield road

22   property is?

23       A.  Not offhand.

24       Q.  Do you know how many parcels of property

1    were owned by Preble?

2        A.  I know there were several and it was based

3    on the loan presentations of Preble or its

4    affiliates.

5        Q.  On page 2 of your summary of notes we start

6    with, "Also pending possible events not disclosed."

7    What does that mean?

8        A.  As a general rule, you did not -- you keep

9    your reprise factual and you do not speculate as to

10   what the future will hold.

11       Q.  And with regard to the October 8 letter

12   what -- in what way did that letter violate that?

13       A.  It is reference to a pending refinancing.

14       Q.  If a customer asks the bank to confirm that

15   a pending refinance -- that there is a pending

16   refinancing, is it your position that the bank

17   ought not do that?

18       A.  Again credit's an interesting thing.  You

19   have to take the specific circumstances.  But if,

20   in fact, the relationship is not satisfactory and

21   you say it's satisfactory and then reference a

22   refinancing, I think the combination there is just

23   like a combination of bad drugs.  You get a

24   negative reaction.  It should not have been done in

1    that context.

2        Q.  Okay.  My question is, obviously the bank

3    has at least enough confidence that it's willing to

4    go forward with the refinancing from its --

5        A.  No without a crutch from the SBA.

6        Q.  But it is willing to go forward with the

7    refinancing --

8            MR. KORNITSKY:  I'm going to object to that

9            question.  Are you saying that -- is that a

10           statement that you're making that the bank was

11           willing to go forward?

12       Q.  The bank had made a refinancing proposal

13   indicating that it was willing to refinance Preble,

14   albeit contingent upon subordination from the SBA,

15   correct?

16           MR. KORNITSKY:  I'm going to object.

17       A.  I believe you're correct, although I would

18   also say that I have not seen commitment letters

19   following that meeting.  So, yes, there was an

20   approval document signed.  Whether commitment

21   letters were ever sent out, I don't know.  I just

22   can't recall.

23       Q.  And I'm going to ask you to assume that we

24   have a situation in which one of the things that

1    the bank customer is doing is telling its vendors,

2    "We are hopeful that we'll have a refinancing and

3    that one is pending," and some of the customers are

4    concerned.  What proof do we have that there's even

5    a refinancing proposal pending?

6            A customer wants the bank to confirm for

7    their vendors, yes, we have applied and there is a

8    refinancing proposal pending.  Is it your position

9    that it is inappropriate for the bank to provide

10   that information directly to the vendors?

11       A.   Yes, it is inappropriate in the context

12   that we have here.

13       Q.   Why?

14       A.   Robert Morris says, if you choose to

15   answer, you answer fully.  And to tell a vendor

16   that that is a satisfactory relationship and that

17   a -- and a refinancing is pending, would lead that

18   person to believe that things were much rosier than

19   they actually were.

20            I think that that combination of facts in

21   the letter was highly misleading.

22       Q.   Not focusing just on the letter right now,

23   my question is, if a customer asks the bank to

24   confirm to its vendors that a refinancing proposal

1    is pending, may the bank do so?

2        A.   They may, as long as they disclose the

3    proper posture of -- the financial posture of the

4    credit and not gild a lily, as we're saying.

5        Q.   If the customer says to the bank, "I'm

6    going to have my vendor call you" -- I'll take out

7    the unsolicited nature.  "I'm going to have my

8    customer call you and I want their -- they're going

9    to ask you, 'Is the refinancing plan pending?'

10   What I want you to do is confirm for them that it

11   is," may the bank do that without more?

12       A.   No.

13       Q.   If the customer calls the bank and says,

14   "Your customer has asked me whether there is a

15   refinancing plan pending?"  What is the bank's

16   appropriate response?

17       A.   As I testified earlier, one possible

18   response would be to say, "Yes, there is a

19   refinancing pending, however, please do not accept

20   any -- any inference that it's going to happen,

21   this is a credit that is in flux.  And that while

22   working with them and they've been a customer for a

23   while this is a -- less than satisfactory

24   situation."

```
 1            Q.   May the bank make that response without

 2       getting prior approval of its customer?

 3            MR. KORNITSKY:  Objection.  I'm wondering

 4            if you want to hear my objection?

 5            MR. BOWIE:  Go ahead.  Yeah, I'm curious,

 6            to be honest with you.

 7            MR. KORNITSKY:  I'm wondering, may the bank

 8            under Maine law, Massachusetts law?  That's

 9            the first part that I would say -- I know we

10            still have that question that's live.

11            A.   Repeat the question, please.

12            Q.   If we're at the hypothetical where the

13       vendor has called the bank and said in effect, "I

14       understand that you have a refinancing pending with

15       your customer, is that true," and my question was,

16       "What could the bank respond?"

17            And I think you told me that it can, but

18       not with a simple yes or no, there needed to be

19       additional information, is that a fair summary of

20       what you just told me?

21            A.   Yes.

22            Q.   My question is, may the bank provide that

23       additional information, without the prior approval

24       of its customer?
```

1      A.   I believe if I did not have -- when I --

2      not what I would do, but a typical banker.  If they

3      didn't have the customer's consent to speak with

4      the vendor, I think they would just decline to

5      comment, is one alternative, or to simply say

6      that -- well, something that would in amount -- you

7      decline to comment.

8           How many words you use, is up to the

9      person.

10     Q.   Under "To do slash questions," you have

11     one, two, three, four -- the fifth entry down, if

12     you will, "Did plaintiff ever see Preble

13     financials, either directly or via credit bureaus."

14     What's that reference to?

15     A.   It simply -- I was curious as to whether

16     Preble had additional information from other

17     sources that would have a bearing on their credit

18     decision.  And this morning -- or at lunchtime I

19     did see the -- the industry credit report, which

20     did not have any financial information on it.

21     Q.   When you say, "Preble," do you mean Preble

22     or do you mean the plaintiffs in this case?

23     A.   I'm sorry, the plaintiff's.  I'm sorry.

24     Q.   Then the next question is, "When further

1    downgraded slash two-bagger," what does that mean?

2        A.   Well, basically, as I testified earlier,

3    this thing should have been downgraded to

4    substandard sometime in the summer, if not before,

5    of '04.  And given the September 30 financials, if

6    not before, this thing should have either gone to

7    substandard or probably doubtful, depending on the

8    bank's comfort with the collateral.

9        And "two-bagger," simply refers to a

10   situation where if a banker has a two digit

11   downgrade, then -- if they were Japanese -- they

12   would be obligated to take their life.

13       Q.   On what basis do you believe that it should

14   have been -- Preble should have been downgraded in

15   the summer?

16       A.   Because on a full following basis, if a

17   company's losing money, as it ultimately was proven

18   in the September financials, you see it in the

19   collateral -- you'll see it in the collateral

20   report.  In other words, losses do not come out of

21   thin air, they come out of collateral.

22       Q.   The next question is, "reconsider use of

23   quote available end quote credit in exhibit 23."

24   What's that reference to?

1        A.   I'm not sure.  I would have to go back and

2   look.  It almost -- it almost ties to the question

3   up above, "paying the line down so aggressively."

4   I just did not do a full availability analysis

5   here.

6        And it was just a question.  I don't think

7   it's something I'm going to pursue.  I also know

8   that the collateral coverage was thin here and

9   certainly not up to the bank policy, but perhaps

10  somewhat adequate.  I didn't do a collateral

11  analysis either.

12       MR. BOWIE:  Can we take a minute.

13       (A recess was taken.)

14       MR. BOWIE:  I have no further questions at

15       this point.  Marc, I'd like a copy, as I said

16       of the file.  I don't care how we do that,

17       whatever's easiest and most expeditious to

18       allow Mr. Clarke to have his file and for me

19       to have a copy.

20       MR. KORNITSKY:  What I'm going to propose

21       that I do is that I would take it, have my

22       paralegal make a complete copy of everything

23       and return the original to Mr. Clarke.  I'll

24       make a copy for you a -- I'll make two copies

1          for you, I'll make one for Susan as well, and

2          one for myself and I'll ship it out tomorrow.

3              (The deposition concluded at 3:30 p.m.)

4                          - - -

SIGNATURE PAGE FOR DEPONENT


    I, the undersigned _____do hereby certify that I have read the foregoing and that to the best of my knowledge, said deposition is true and accurate (with the exception of the following desired changes listed (below):

PAGE      LINE     CHANGE










                                              _____
                                            DEPONENT'S SIGNATURE

Subscribed and sworn before me this _____ day of _____, 20____.
EXP. DATE:_____    NOTARY PUBLIC  _____

<u>C E R T I F I C A T E</u>

I, ALLYSON M. DANFORTH, RPR, a Notary Public in and for the County of Essex, Commonwealth of Massachusetts, do hereby certify that the within-named deponent was sworn to testify the truth, the whole truth, and nothing but the truth, in the aforementioned cause of action.

I further certify that this deposition was stenographically reported by me and later reduced to print through Computer-Aided Transcription, and the foregoing is a full and true record of the testimony given by the deponent.

I further certify that I am a disinterested person in the event or outcome of the above-named cause of action.

IN WITNESS WHEREOF, I have hereunto affixed my hand and official seal this 25th day of April, 2006.

*Allyson M. Danforth*

ALLYSON M. DANFORTH, RPR,
Notary Public,
Commonwealth of Massachusetts

My Commission Expires:
August 8, 2008